Slip Op. 17 - 48

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - -x
AJINOMOTO NORTH AMERICA, INC.,      :

                    Plaintiff,:

           v.         :       Court No. 14-00351

UNITED STATES,                       :

                Defendant.:
- - - - - - - - - - - - - - - - - -x

<u>Opinion & Order</u>

[Plaintiff's motion for judgment on the agency record,
 contesting surrogate-value determinations based thereon,
 granted in part; remanded to the International Trade
 Administration.]


                    Dated: April 25, 2017

     <u>Iain R. McPhie</u>, <u>Peter J. Koenig</u>, and <u>Nicholas Galbraith</u>,
<u>Squire Patton Boggs (US) LLP</u>, Washington, D.C., for the plaintiff.

     <u>Alexander O. Canizares</u>, Trial Attorney, Commercial Litigation
Branch, Civil Division, U.S. Department of Justice, Washington,
D.C.; <u>Aman Kakar</u>, Attorney, Office of the Chief Counsel for Trade
Enforcement & Compliance, U.S. Department of Commerce, of counsel;
for the defendant.


      AQUILINO, Senior Judge:   This action challenges
determinations of the International Trade Administration, U.S.
Department of Commerce ("ITA") <u>sub</u> <u>nom</u>. <u>Monosodium Glutamate From
the People's Republic of China: Final Determination of Sales at
Less Than Fair Value and the Final Affirmative Determination of
Critical Circumstances</u>, 79 Fed.Reg. 58326 (Sept. 29, 2014), Public

Record Document ("PDoc") 279 ("<u>Final Determination</u>"); <u>Monosodium</u>

<u>Glutamate From the People's Republic of China . . . : Antidumping</u>

<u>Duty Orders; and . . . . Amended Final Determination of Sales at Less</u>

<u>Than Fair Value</u>, 79 Fed.Reg. 70505 (Nov. 26, 2014), PDoc 270; and

<u>Monosodium Glutamate From the People's Republic of China: Second</u>

<u>Amended Final Determination of Sales at Less Than Fair Value and</u>

<u>Amended Antidumping Duty Order</u>, 80 Fed.Reg. 487 (Jan. 6, 2015).

The plaintiff U.S. manufacturer of monosodium glutamate ("MSG") and

petitioner below has interposed a motion for judgment on the agency

record in accordance with USCIT Rule 56.2 on its complaint,

confirming jurisdiction of this court pursuant to 19 U.S.C. §§

1516a(a)(2)(A)(i)(II) and (2)(B)(i) and 28 U.S.C. §1581(c).


        ITA is directed by statute, 19 U.S.C. §1677b(c)(1), to

seek surrogate values for the factors of production ("FOPs") for

subject merchandise produced in or exported from *a* non-market

economy *a la* the People's Republic of China ("PRC").  The plaintiff

alleges error in such valuations herein of corn, lignite, high-

protein scrap from sugar manufacture, and inland freight (including

alleged error in ITA's rejection of factual information relating

thereto).

I

With regard to the corn FOP, ITA's preliminary determination based it upon the actual weight of corn consumption by "Meihua"[1], the proceeding's mandatory respondent.  <u>See</u> Prelim. Analysis Memo (May 7, 2014), CDoc 109, at 7-8, 303.  For the <u>Final Determination</u>, the agency used Meihua's standard weight of corn consumption rather than the actual weight. <u>See</u> Meihua Analysis Memo for the Final Determination (Sept. 22, 2014), PDoc 257, at 5.  <u>See also</u> Allegation of Ministerial Errors Memo (Nov. 20, 2014), PDoc 266, at 2.  The plaintiff argues this amounted to deviation from ITA's policy of calculating surrogate values based upon producers' actual production experiences.

Without conceding error, the defendant requests voluntary remand in order to consider this argument in the first instance. As its "concern" appears "substantial and legitimate", <u>see</u> <u>SKF USA Inc. v. United States</u>, 254 F.3d 1022, 1029 (Fed.Cir. 2001), the request for that purpose can be, and it hereby is, granted.

---

[1]     "Meihua" consists of Langfang Meihua Bio-Technology Co., Ltd., Tongliao Meihua Biological SCI-TECH Co., Ltd., Meihua Group International Trading (Hong Kong) Limited, Meihua Holdings Group Co., Ltd., Meihua Holdings Group Co., Ltd., Bazhou Branch. <u>See</u> Prelim. Decision Memo (May 1, 2014), PDoc 194, at 8-9.

II

The plaintiff challenges ITA's reliance upon *"coalspot.com"* to value the lignite FOP by Meihua.  It argues that those data are flawed because they (1) reflect "estimated prices, not the required real prices"; (2) are derived from "Indonesian coal reference prices"; (3) are export prices "while [agency] precedent is to use domestic or import prices", and (4) are not clearly exclusive of taxes.  The plaintiff also argues ITA should have used Indonesian import price data under HTS 2702.10 or similar import data from other countries.

Substantial evidence supports ITA's decision to rely upon *coalspot.com*, however.  It found that those data met each of the factors of reliability it generally considers: they reflected a broad market average, were publicly available, were product specific, were exclusive of duties, and were contemporaneous with the period of investigation.[2]  Issues and decision memorandum accompanying <u>Final Determination</u> ("<u>IDM</u>"), p. 25.  ITA considered

---

[2]  ITA's practice is to test proposed FOP values to determine if they reflect (1) a broad market average, (2) publicly available information, (3) product specificity, (4) tax and duty-free neutrality, and (5) contemporaneity with the period of investigation or review.  <u>E.g.</u>, <u>Notice of Final Determination of Sales at Less Than Fair Value: Certain Frozen and Canned Warmwater Shrimp From the People's Republic of China</u>, 69 Fed.Reg. 70997 (Dec. 8, 2004), and accompanying issues and decision memorandum ("I&D Memo") at cmt 1.

the lack of clarity as to whether the data excluded taxes and determined that they were nevertheless the best available record information, based upon its consideration of all of the factors. See id.

The plaintiff argues that the *coalspot.com* data are "estimates", contending they are "based not on real prices". However, ITA found a notation on the *coalspot.com* printout in the record to indicate that the prices therein "constitute coal prices for spot sales", i.e., prices based on actual sales in March 2014. See Meihua's Surrogate Country and Surrogate Value Cmts (April 7, 2014), PDoc 126, at Ex. 9, p. 5.

Plaintiff's position focuses primarily on ITA's contrary analysis in Certain Polyester Staple Fiber from the People's Republic of China, 78 Fed.Reg. 2366 (Jan. 11, 2013), I&D Memo (Jan. 4, 2013) at cmt. 1 ("Polyester Staple Fiber"), a previous antidumping-duty investigation, asserting that using *coalspot.com* is contrary to its valuation of Indonesian steam coal therein. In that matter, the agency calculated a surrogate value for steam coal used to produce synthetic staple fibers. See PDoc 145. Noting that it prefers actual transaction prices, ITA declined to use prices sourced from the Indonesia Minister of Energy and Mineral Resources of the Republic of Indonesia (ESDM), which "contains

information from international benchmark steam coal indexes and certain brand name prices, rather than actual transactions involving parties in Indonesia . . . and some of the ESDM values appear to be derived from government indexes based on non-Indonesian reference values". <u>Id</u>. at 5-6. ITA thereupon concluded that Global Trade Atlas data were the best information available. <u>Id</u>.

Here, the defendant responds that the agency did not specifically consider *coalspot.com* in <u>Polyester Staple Fiber</u> and that, although those data regarding lignite were sourced from Indonesia's Director General of Mineral and Coal, it is unclear whether they are substantively equivalent to the ESDM data related to steam coal in <u>Polyester Staple Fiber</u>.  The defendant thus contends there is no clear basis to assume that ITA's concerns about the ESDM data would or should extend to the *coalspot.com* data at bar.

The plaintiff considers this dissembling, arguing that the *coalspot.com* data suffer from precisely the same flaws as did the pricing data ITA rejected in <u>Polyester Staple Fiber</u>, to wit, the reported price is calculated "based on January 2013 HBA/HPB Index", the source is identified as "The Directorate General of Mineral, Coal and Geothermal, Ministry of Energy and Mineral

Resources" (i.e., ESDM), and HBA is defined as an average of "four international coal indices" (i.e., non-Indonesian reference values), including ICI 1, Platts 5900, New Castle Export Index, and Global Coal New Castle Index.

Be that as it may, notwithstanding the disadvantages of the ESDM data identified in Polyester Staple Fiber as compared with actual transactions, ITA did not declare that it would never use international indexes and company-specific brand prices.  Suffice it to state here that there are imperfections in the available data of record, and it was not unreasonable for the agency to prefer *coalspot.com* as sufficiently reliable when compared to other data. The plaintiff suggests that ITA always prefers import prices, however there is administrative precedent for using export prices as the "best" information available, and the use of export prices here was within its discretion. See, e.g., Certain Cut-to-Length Carbon Steel Plate from Romania, 70 Fed.Reg. 12651 (March 15, 2005) (final admin. review), and accompanying I&D Memo at cmt. 3.

Similarly, ITA's rationale as to why it did not use the 2012 Indonesian import data for HTS 2702.10 urged by the plaintiff is supported by substantial evidence.  It noted that those data were not contemporaneous with the period of investigation (indeed,

Indonesia apparently had no imports under HTS 2702.10 in 2013). The defendant notes that, although not dispositive, contemporaneity of data is an important factor when evaluating surrogate values. Def's Resp. at 19, referencing <u>Certain Polyester Staple Fiber From The People's Republic of China</u>, 75 Fed.Reg. 1336 (Jan. 11, 2010) and accompanying I&D Memo at cmt. 1.

Perhaps more tellingly, the lignite imported into Indonesia in 2012 under HTS 2702.10 consisted in total volume to the equivalent of a single shipment[3] of 3.28 metric tons (MT), <u>see IDM</u> at 26, which low volume is consistent with the fact that Indonesia is a large domestic producer of that coal. <u>See</u> Meihua's Resubmission of Rebuttal Surrogate Country and Surrogate Value Comments (April 30, 2014), PDoc 188, Ex. 8 (Indonesia is the second largest producer of lignite). Given record evidence that that nation produces approximately 160 million MT of lignite a year, it was not unreasonable for ITA to rely upon broad and contemporaneous data instead of a single shipment of 3.28 MT of coal made before the period of investigation.

---

[3] The plaintiff argues there is no indication in the import data itself that these import(s) only constituted a "single shipment" and that ITA identifies no basis in the record for concluding that 3.28 MT of imports does not represent commercial quantities, but this argument is over a tangential matter in the determination that does not merit relief.

The plaintiff suggests that ITA "could have" used coal import data from other countries such as Thailand, Colombia, South Africa, or Ecuador.  It contends that such secondary surrogate country data may be used "where an input cannot be valued in the selected surrogate country." Pl's Br. at 15.  The court, however, cannot supplant a reasonable determination on the sufficiency of the *coalspot.com* data that comports with the agency's practice of preferring to value all FOPs from a single primary surrogate country whenever possible in accordance with 19 C.F.R. §351.408(c)(2).  IDM at 26.  See Jiaxing Bro. Fastener Co. v. United States, 38 CIT ___, ___, 11 F.Supp.3d 1326, 1332–33 (2014), aff'd, 822 F.3d 1289 (Fed.Cir. 2016).  Which is another way of stating that the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's approach from being supported by substantial evidence. Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

The plaintiff contends that ITA should have used pricing data from other countries on the record as "benchmarks to assess the accuracy of the Indonesian import values from 2012." Pl's Br. at 16.  This argument appears to be raised for the first time now, as it does not appear in case briefs before the agency. See Pet's Case Br. (July 31, 2014) at 12-14, PDoc 229; Pet's Rebuttal Br.

(Aug. 7, 2014) at 1-8, PDoc 232. If so, it must be deemed waived for lack of exhaustion at the administrative level. <u>See</u> 28 U.S.C. §2637(d). <u>See</u>, <u>e.g.</u>, <u>Mittal Steel Point Lisas Ltd. v. United States</u>, 548 F.3d 1375, 1383-84 (Fed.Cir. 2008) (finding that a party failed to exhaust its administrative remedies when it chose not to comment on ITA's draft remand results); <u>Rhone Poulenc, Inc. v. United States</u>, 899 F.2d 1185, 1191 (Fed.Cir. 1990) (appellant waived argument even though it was characterized as "simply another angle to an issue" raised). In any event, there appears to be no contrary evidence of record that might have compelled ITA to employ benchmarks to assess the accuracy of data that it had identified as reliable by other means.

III

The plaintiff next challenges ITA's selection of Indonesian HTS 2303.10.9000 as the best available to determine the surrogate value of high-protein scrap. It argues that Indonesian HTS 2303.20.0000 covering "waste of sugar manufacture" was the correct classification to value that scrap, but that, because there were no Indonesian imports in this classification during the period of investigation, ITA should have used the comparable HTS classification for Thailand. It further argues that ITA's analysis

of the use of high-protein scrap in Meihua's production process
"confuses inputs with outputs." Pl's Br. at 18.  According to the
plaintiff, starch milk is the input for this production step, while
glucose, a form of sugar, is the output, and thus the high-protein
scrap by-product constitutes waste of "sugar manufacture." Id. at
19.

          In essence, plaintiff's position is that a more
product-specific HTS category could have been used but was not.
Even assuming that other data existed that were more specific to
the product, that is insufficient to disturb the administrative
selection of the best available information based upon its weighing
of all relevant factors so long as that determination is a
reasonable choice.  See, e.g., Nation Ford Chemical Co. v. United
States, 166 F.3d 1373, 1377 (Fed.Cir. 1999) (ITA has "wide
discretion in the valuation of factors or production").  The
plaintiff does not take issue with ITA's conclusion that the
Indonesian HTS 2303.10.9000 classification meets the other four
factors that the agency typically considers.  See IDM at 28.  In
particular, ITA found that that classification was representative
of broad market averages, publicly available, tax and duty
exclusive, and contemporaneous with the period of investigation.
Id.

The defendant argues the product specificity factor weighs in favor of the data ITA used and against those advocated by the plaintiff, explaining that, unlike the Thailand HTS category urged by the plaintiff, Indonesian HTS 2303.10.9000 is specific to the primary surrogate country and is consistent with the agency's preference for primary surrogate country data to reduce distortion. Def's Resp. at 22, citing 19 C.F.R. §351.408(c)(2). Moreover, it continues, ITA determined that Indonesian HTS 2303.10.9000 properly applied to the high-protein scrap used by Meihua, based upon its analysis of the record evidence regarding Meihua's manufacturing process. Id., referencing IDM at 28.

That appears to be the case. The record shows that the high-protein scrap in question is a byproduct that emerges in the production of MSG. See Meihua's Section D Questionnaire Response (March 10, 2014), CDoc 61, at 21 and Ex. D-1; Meihua Analysis Memo, CDoc 226, at 5 and Attachment IV. Based on the confidential record, it was not unreasonable for ITA to use an HTS category that includes both "residues of starch manufacture" and "other wastes of sugar" to value the high-protein scrap, and the plaintiff does not persuade from the record that the high-protein scrap can only be classified as a "waste of sugar manufacture" under Indonesian HTS 2303.20.0000 or that the glucose Meihua produced constitutes

"sugar" under that tariff item. <u>See</u> Pl's Br. at 18-19.   ITA's "judgment call" that Indonesian HTS 2303.10.9000 was preferable to other evidence is one that cannot here be overturned. <u>See</u> <u>Lifestyle Enterprise, Inc. v. United States</u>, 751 F.3d 1371, 1378 (Fed.Cir. 2014) ("[w]hen all the available information is flawed in some way, [ITA] must make a judgment call as to what constitutes the 'best' information").

IV

On plaintiff's challenge to ITA's valuation of inland freight, it preliminarily valued such freight using a rate from <u>Doing Business Indonesia 2013</u> ("DBI"), a World Bank report, based on a distance of 14.42 kilometers (8.96 miles) from Jakarta center to that city's commercial shipping port. For the <u>Final Determination</u>, the agency added to the record the distances from several "periurban districts to the port of Jakarta" and, based on the average thereof, it revised the inland freight calculation to 65.08 kilometers[4].   ITA claimed that the propriety of those

---

[4]   <u>IDM</u> at 7.   These ITA obtained from the record of the inland freight considered in <u>Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review and New Shipper Review; 2011-2012</u> (April 7, 2014).   The inland freight determination thereof was challenged on other grounds and recently sustained <u>sub</u> <u>nom</u>. <u>An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States</u>, 40 CIT ___, ___, 179 F.Supp.3d 1256, 1284 (2016).

additions was consistent with the DBI methodology because that report states that the businesses responding to the survey are located "in the periurban areas of the economy's largest business city." <u>IDM</u> at 7.

The "periurban area" of Jakarta is a fuzzy concept. Certainly, it is unclear from the record what that area actually encompasses: the DBI study does not define the geographical ambit of the term as applied to Jakarta, and the papers herein do not clarify. As it is unclear whether the distances ITA placed on the record are actually from "periurban" areas of Jakarta, its statement to that effect in its Freight Distance Memo dated August 14, 2014 is simply conclusory or <u>ipse</u> <u>dixit</u>.

The fact that those distances were used in a different proceeding is of no moment here. In the final analysis, ITA's reliance upon the information it placed on the record, without clarification that those areas are, in fact, "periurban" areas of Jakarta, does not amount to substantial evidence[5]. This is

---

[5] <u>See</u>, <u>e.g.</u>, <u>U.S. Magnesium LLC v. United States</u>, 37 CIT ___, ___, 895 F.Supp.2d 1319, 1328 (2013). Furthermore, even assuming ITA could reasonably interpret that the "periurban area" of Jakarta encompasses the locations and distances it placed on the record, it is unclear whether they provide a representative sample of "typical" exporters to the port of Jakarta, and plaintiff's lament in that regard that ITA's average does not include any distance from within the city of Jakarta itself is valid to the

(continued...)

particularly true of the Cianjur location, which is apparently in a province that does not even border on the city of Jakarta.  See Pl's Br. at 9.  In short, ITA has not met its burden to reasonably select the "best available information" in setting the distance used to calculate a value for inland freight.  See 19 U.S.C. §1677(c)(1)(B).  See also Blue Field (Sichuan) Food Industrial Co. v. United States, 37 CIT ___, ___, 949 F.Supp.2d 1311, 1336 (2013) ("[t]he court will uphold [ITA]'s surrogate value choices [only] if the agency fairly considered record evidence when choosing surrogates, so that a reasonable mind could accept [it]s findings").

Noted in passing here is plaintiff's further argument that regardless of whether the "periurban area" of Jakarta includes both locations within Jakarta and in other jurisdictions, the TAB Survey "makes clear" that the DBI report is based on data collected only from business located "within the city limits", i.e., collected only for companies "located in" or "operating in" the

---

[5]  (...continued)
extent ITA did not include the preliminary distance from the center of Jakarta to its port in its average calculation.  See Pl's Br. at 9.

city of Jakarta.[6]  However, it does not necessarily follow that

"located in" and "operating in" can only be interpreted as "within

the city limits", as argued by the plaintiff, as opposed to ITA's

"looser"  interpretation  of  such  terms  as  encompassing  the

"periurban area" of the city of Jakarta, which is consistent with

what the DBI survey claims to be based upon.

V

        The plaintiff challenges ITA's rejection of its August

28, 2015 submission of factual data for purposes of calculating

inland freight costs.  It argues that its submission consisted of

"factual information relating to distances from locations other

---

        [6]  See Pet's Distance Cmts, PDoc 248, at Ex. 1.  The TAB
Survey template provides the following definitions:

> DESTINATION: Company "ABC" located in «Survey_City» seeks
> to trade with «DB_tab_PrepopulationEconomyName»'s largest
> overseas trading partner via ocean transportation through
> its main port (in the case of landlocked countries the
> port is the most commonly used in a neighboring country).
> . . .
> COMPANY "ABC":
> · operates in «Survey_City», and employs 60 workers or
> more;
> · is a private, limited liability company, registered and
> operating under the commercial laws of the country;
> · is domestically-owned with no foreign ownership;
> · exports over 10% of its sales to international markets;
> does not operate within an export processing zone or
> industrial estate with special export/import privileges.

See PDoc 248 at Ex. 1 (plaintiff's emphasis).

than those included in [ITA]'s filing" that "fit squarely within
the scope" of ITA's invitation for submissions and 19 C.F.R.
§351.301(c)(4).  Pl's Br. at 19.

Elaborating, the plaintiff argues that nothing in that
section 351.301(c)(4) precluded submission of alternative data to
calculate freight. It points out that, while 19 C.F.R.
§351.301(c)(3)(iv) limits a party from placing "additional,
previously absent-from-the-record alternative surrogate value
information" on the record to "rebut, clarify, or correct" factual
information placed on the record by another interested party,
section 351.301(c)(4) contains no such limitation in cases in which
data are placed on the record by the agency.

The defendant contends ITA's determination to reject the
submission was proper and consistent with regulation, and that the
plaintiff does not dispute that its August 28 proffer consisted of
an alternative to the information on the record. See Pl's Br. at
19 (data related to "distances from locations other than those
included in [ITA]'s filing").  The defendant argues this "new
factual information" did not respond to the factual information
offered by ITA and that plaintiff's objective was plainly to expand

the scope of the record and to persuade the agency to use such new information and revise surrogate value accordingly.[7]

The plaintiff, nonetheless, asserts that 19 C.F.R. §351.301(c)(4) authorized its submission of alternative data. That provision was codified in April 2013 as part of several rule changes governing time limits for submitting factual information in antidumping-duty and countervailing-duty proceedings.[8] Among the purposes of the changes, the plaintiff points out, was to "ensure that [ITA] has sufficient opportunity to review submissions of factual information." Definition of Factual Information and Time Limits for Submission of Factual Information, 78 Fed.Reg. 21246, 21246 (April 10, 2013). See id. at 21250. They identified five categories of factual information with associated time limits. 19 C.F.R. §351.301(c)(1)-(5). Submissions of factual information to value factors of production are due no later than 30 days before

---

[7]   The defendant emphasizes that the plaintiff used that information to calculate a new surrogate value. See Distance Comments, PDoc 247; Pet's Resp. to Rejection Memo, PDoc 251.

[8]   See 19 C.F.R. §351.301. "Factual information" for purposes of this section is defined, in relevant part, as "[e]vidence, including statements of fact, documents and data placed on the record by [ITA], or, evidence submitted by any interested party to rebut, clarify or correct such evidence placed on the record by [ITA]." 19 C.F.R. §351.102(b)(21)(iv); See subsection 351.301(a).

the scheduled date of the preliminary results of review.  Section

351.301(c)(3)(i).  Under subsection (c)(3)(iv), an interested party

has "one opportunity to submit publicly available information to

rebut, clarify, or correct" factual information submitted to value

factors of production, but such party "may not submit additional,

previously absent-from-the-record alternative surrogate value

information".  Similarly, and of more relevance here, section

351.301(c)(4) provides as follows:

> Factual information placed on the record of the
> proceeding by [ITA]. [ITA] may place factual information
> on the record of the proceeding at any time. An
> interested party is permitted one opportunity to submit
> factual information to rebut, clarify, or correct factual
> information placed on the record of the proceeding by
> [ITA] by a date specified by the Secretary.

On the interpretation of 19 C.F.R. §351.301(c) generally,

the parties argue over Husteel Co. v. United States, which

considered and rejected argument over whether the specific

provision of 19 C.F.R. §351.301(c)(1)(v) permitted parties to

submit alternative surrogate data.  39 CIT ___, ___, 98 F.Supp.3d

1315, 1341-42 (2015) (holding that a party's submission of a

financial statement was a "substitute data source" and not "factual

information to rebut, clarify, or correct" for purposes of that

provision).

As noted therein, "'[r]ebuttal evidence' is generally understood to be 'evidence offered to disprove or contradict the evidence presented by an opposing party.'" 39 CIT at ___, 98 F.Supp.3d at 1341, quoting Black's Law Dictionary (10th ed. 2014). The defendant here contends Husteel stands for the proposition that a substitute data source does not constitute "factual information to rebut, clarify, or correct" previously submitted factual information.   The plaintiff contends Husteel's rejection of a party's information submitted per 19 C.F.R. §351.301(c)(1)(v) was not because the rejected information was alternative surrogate-value information, as ITA claims, but because the rejected information did not relate to, and therefore did not "rebut", the information to which it purportedly responded.

Plaintiff's is the more persuasive characterization of Husteel.  In that case, the respondent NEXTEEL provided a breakdown of its cost and sale information in a supplemental questionnaire response. The petitioner then responded by submitting a "large amount of new factual information", including a financial statement, "purporting to 'rebut, clarify or correct'" the evidence submitted in the questionnaire response.   39 CIT at ___, 98 F.Supp.3d at 1338.  The court found that the financial statement, which ITA used to calculate constructed value ("CV") profit, did

not "disprove or contradict" the limited sales and cost information in the questionnaire response and therefore did not constitute "factual information to rebut, clarify or correct" that information as required by the regulation.[9]

In the matter at bar, however, there is no question, and the defendant does not convincingly dispute, that the periurban distance information submitted by the petitioner responded and related directly to the information placed on the record by ITA. It was, in short, intended to "rebut, clarify or correct factual information placed on the record of the proceeding by [ITA]", <u>see</u> 19 C.F.R. §351.301(c)(4), notwithstanding that it includes a "new" surrogate-value calculation that can be characterized as such, but it was intended as evidence contradicting ITA's calculation.

The defendant considers <u>Baroque Timber Indus. (Zhongshan) Co. v. United States</u>, 35 CIT ___, ___, 925 F.Supp.2d 1332, 1349-50

---

[9]   39 CIT at ___, 98 F.Supp.3d at 1341-43.  Specifically, the court noted:

> NEXTEEL was asked to break down its costs and sales by country of sale and product type. <u>Little if anything in U.S. Steel's factual submission, and especially the evidence in Tenaris's 2012 financial statement, disproves or contradicts NEXTEEL's answers to those questions</u>. Rather, U.S. Steel's submission constituted a substitute data source that [ITA] could use to calculate CV profit.

Emphasis added.

(2013), instructive.   Considered therein was the meaning of the phrase "factual information to rebut, clarify, or correct" in section 351.301(c)(1) of the regulation governing factual information submitted in response to questionnaires.  Rejecting the respondent's argument that any type of information may be provided to rebut, clarify, or correct information under section 351.301(c)(1), <u>Baroque Timber</u> sustained ITA's interpretation of the phrase in subsection 351.301(c)(1) as excluding new surrogate-value data.  That decision deferred to ITA's interpretation of the former regulation as prohibiting the introduction of new surrogate-value data where it was silent on the question and ITA's interpretation was not "erroneous or inconsistent" with the regulation itself.

Here, the plaintiff points out, and this court concurs, that ITA's interpretation is now "erroneous or inconsistent" with regard to the new regulation because the new one is no longer silent on the question.  Instead, the agency has adopted one provision, to wit, 19 C.F.R. §351.301(c)(3)(iv) (information submitted by parties), that expressly prohibits the submission of "additional, previously absent-from-the-record alternative surrogate value information" as well as the use of new information to value FOPs when submitted to rebut, clarify or correct such FOP information, while the provision at issue here, 19 C.F.R.

§351.301(c)(4)  (information  submitted  by  ITA),  has  no  such
prohibition.    The  defendant  fails  to  explain  how  ITA  can
reasonably    interpret    the    prohibition    of    19    C.F.R.
§351.301(c)(3)(iv)  to  apply  to  19  C.F.R.  §351.301(c)(4)  when  the
agency  expressly  chose  to  include  it  only  in  subsection  (c)(3)(iv).

         Furthermore,  defendant's  argument  that  interpreting  the
regulation  to  permit  parties  to  submit  new  surrogate-value
information  would  defeat  the  purpose  of  encouraging  the  parties  to
submit  information  within  time  limits  is  baseless.    The  argument
impermissibly  begs  the  question  of  what  the  deadline  is,  because
the  petitioner  did,  in  fact,  submit  the  information  within  the
deadlines:    parties  have  only  "one  opportunity"  to  submit
additional  information  in  response  to  ITA's  placing  information  on
the  record  <u>viz</u>.  19  C.F.R.  §351.301(c)(3)(iv)  ("[a]n  interested
party  is  permitted  one  opportunity  to  submit  publicly  available
information"),  and  parties  will  presumably  do  so.    Additionally,
the  logic  of  the  argument  falls  short  because  parties  will  not  know
at  the  time  of  the  normal  deadline  whether  such  an  opportunity  will
be  afforded  in  a  given  proceeding,  and  they  therefore  will  have
every  incentive  to  submit  all  relevant  information  by  the  original
deadline  to  ensure  that  it  is  considered.    The  defendant  argues  the

petitioner <u>did</u> have an opportunity to submit inland-freight distance information at the onset when it submitted its initial surrogate-value data due April 7, 2014, however the specific issue of distances relevant to the "periurban area of Jakarta" does not appear to have arisen until ITA placed its memorandum on the file directly, with new information specific thereto.  ITA's claim of a procedural impediment in rejecting the petitioner's submission, rather than considering it in the context of information intended to rebut, clarify or correct, was therefore in error.

VI

In view of the foregoing, plaintiff's motion for judgment on the agency record must be granted to the extent of remand to ITA for reconsideration of the issues of (1) the appropriate corn FOP weight and (2) the calculation of an inland-freight surrogate value.  The results of this remand shall be filed on or before July 31, 2017, with any comments thereon due within 30 days of the filing thereof.

So ordered.

Dated:  New York, New York
        April 25, 2017

                                    /s/ Thomas J. Aquilino, Jr.
                                          Senior Judge